May it please the Court, Justice Fieser, Justice O'Scallion, Justice Trott. Thanks for the proposal. None of us are justices. We're all judges of the United States Court of Appeals. One of our late colleagues said there is no justice on the Ninth Circuit. O'Scallion, Judge Trott. As you know, my name is James Greiner. I represent the appellant, David King. I would like to reserve five minutes for rebuttal. Just watch the clock. I will do that. Thank you, Your Honor. There are three arguments before this Court. And as I say, each time when I'm invited to the Ninth Circuit for oral argument, I take it as a privilege to be here. I try not to waste the Court's time, and I'm going to do the same today. But again, I take it as a privilege to be invited to oral argument. The three arguments that are put forth by the appellant are violation of the Speedy Trial Act, the search warrant, and the what has been named prosecutorial misconduct or a motion to dismiss based upon the alleged goading. Alleged goading, correct. I would like to take those in reverse order because I believe I would like to spend the majority of my time on the Speedy Trial Act.  Sure. In the argument regarding the goading, I think it comes down to the fact that what occurred in the morning of the first trial when the motions were made for new trial and motion for dismissal, when the district court heard the motion and said, Mr. Greiner, I didn't observe anybody sleeping, I'm going to dismiss your motions that you made, and then the government voluntarily said, well, Your Honor, we also say that we didn't see anything, we didn't hear anything, the FBI and the government. Is that after the motion for mistrial? Yes, Your Honor. I made the motion for the mistrial. I don't see how you could possibly be goaded after you made the motion. It's on the table. Right. The motion is on the table. Government opposed. The motion is on the table. Right. What the goading comes to, or at least what the argument is, what the goading comes to is not to be able to make that motion again, not to renew it. The government is saying, the argument is, the government is saying, look, Mr. Greiner, the court said they didn't see anybody sleeping. The government is saying, you know, we agree with the court. We were watching. We didn't see any. In fact, the FBI never saw anybody sleeping. Therefore, don't bring this motion again because it doesn't exist. That's the goading. Obviously, Judge Trott, it's not because the motion was preempted. I made the motion. There's no doubt about that. But the goading comes to the argument of, don't make this motion again. And I think that's where the Supreme Court cases that I cited, the Scott case. You were goaded into making it again because somebody said don't? Following the Scott case and the Divitz case and the holdings from the United States Supreme Court, that is what the argument is. Now, whether this Court takes that as factually true or agrees with that argument, that's going to be your decision. But that's what the argument is as far as that case. The remedy for that would be a reversal and a remand. That would be the remedy. Okay. How about the motion to suppress? The motion to suppress. It comes down to this. The motion to suppress, sitting in the offices where we do, preparing for trial, looking at the issues that we look at, the motion is that Special Agent Osborne in the affidavit continually told the magistrate as more fully described below. And so as you read through the search warrant, you're looking for the issues more fully described below. And as — and I was trial counsel when I was preparing that motion. As I'm looking at more fully described below, I'm expecting to see some factual nexus. Now, granted, Special Agent Osborne, when he made the application for the search warrant, he set forth all of the potential defendants and set forth all of the facts in the case. And that's important in this argument, but it's more important in the speedy trial argument. The reason is there's no more investigation done once that search warrant is applied for to the magistrate. Well, are you making a Franks claim? Well, I'm suggesting that there was a Franks argument, that we should have been. What's the false statement? The false statement is by the FBI agent saying more fully described below and never in the affidavit is there any issue more fully described below. It doesn't tie the Thunderbird and the Sebring into where appellant was in and around that vehicle. And therefore, that's the issue that the Franks hearing should have been at, is where in the affidavit that the magistrate reads. And I understand the world, totality of the circumstances, looking at the entire affidavit, but where in that affidavit does the FBI agent, Special Agent Osborne, say, magistrate, here's where appellant is in and around that vehicle such that you can search it. And when the language in, seen, quote, seen in and around, unquote, that's in the affidavit for the search warrant, is it not? It's in the affidavit for the search warrant. But what the affidavit says is I will tell you, magistrate, below where it's in and around. The facts of in and around that Thunderbird and Sebring, my reading of the affidavit, do not exist. So when they have to say the affidavit. Scalia. All right. Suppose that particular passage was not there, as more fully described below. So just suppose that's not there. The affidavit is still sufficient, is it not? Only for the Bamford resident, not for the Thunderbird, not for the Sebring. And that's where the issue is. It's the search of the Thunderbird and the Sebring, more fully described below, that I think, reading it, making the motion, the agent did not tell the magistrate or give the magistrate. But it mentioned the Thunderbird and the Sebring. Not with a nexus to the appellant. Not how the appellant was in and around doing criminal activity such that it ties into the affidavit. That's what the argument is. Certainly there was search warrant was sufficient for Bamford. I'm not trying to argue that, and I wasn't trying to argue that at the district court. Was the Cutlass involved? In the search warrant or in my motion? In my motion, no. It was just the Thunderbird and the Sebring. Okay. If you're asking was the Cutlass involved in the case, correct. But I didn't address that because I didn't think I factually had a basis to do it. I believe, I still do as I stand here before the Court, that I have a factual basis to say the Thunderbird and the Sebring, when you look at the affidavit, there's not a factual basis. Vehicles described in Attachment A are believed to be under the control of Shandy King, Dorian Thomas, Simonson Barker. Affidavit A, does that name the Thunderbird and the Sebring? It does list the Thunderbird and the Sebring. Correct. But what I'm trying to, and probably inartfully, but what I'm trying to carve out is I'm saying when the magistrate reads the affidavit and gets to the language more fully described below how the Thunderbird and the Sebring is involved in the criminal activity or tied to the appellant such that there's probable cause to search it, there is no more fully described below facts. On page 26, he says, Based on my experience, it's common for perpetrators to maintain documents within their residence or vehicles. And then it says, And these vehicles belong to these people. Therefore, I believe that they may have stuff. That they may have stuff. But that's the reference right there. It is described. It is. You say it's a lousy description and it doesn't tie anything in, but there it's described. It's described, but it doesn't describe appellant doing criminal activity in or out. It makes a generalization. And my argument is that in the search warrant affidavit, there has to be some sort of particularity. I mean, that's, I believe the Fourth Amendment requires some particularity. Next. That's my argument on that. All right. The Speedy Trial Act. I need some. Sorry. The remedy for the search warrant would be to reverse remand to hold the Franks hearing. That would be a remedy in the main circuit. All right. Now. Now, on the search warrant, the problem I have is that we have this Henderson case. You mean the Speedy Trial Act? You mean the Speedy Trial Act? I'm sorry. I meant the Speedy Trial Act. Excuse me. Excuse me. We have this. Out of the United States Supreme Court. The Henderson case out of the United States Supreme Court? Yes. Correct. The issue that's troubling me is the restart issue. Help me sort that out. All right. Let me see if I can do that. I think what we're dealing with here, Title 18, Section 3161H7, I believe that's what we're talking about. This Court has held in Hall and Lewis and Messner, although for some reason I have in my mind Messino, but that's not how the case is titled. Those three cases almost fit exactly this case on its facts. The Henderson case from the United States Supreme Court I do not read as overruling or directing this Court not to grant the remedy of reverse and remand to the district court to decide whether it should be dismissed, the indictment, with or without prejudice. Here's why. What I believe occurred in this case happened in the Hall case. And what happened in the Hall case was that the appellant in the Hall case was dragged along with a defendant that was never going to go to trial, and a plea agreement was reached in the Hall case to obtain testimony from that co-defendant to testify against Hall. And that's exactly what happened here. When the first indictment came down, May 8, 2003, three defendants were named. But let me stop the picture there for a minute, because as I was mentioning in the search warrant argument, when the search warrant was given to the magistrate, that affidavit listed the entire investigation, defendants, all potential, all investigation done, nothing as far as investigation, nothing as far as potential defendants was added to or subtracted after that affidavit. When the United States government indicted on May 8, 2003, they indicted appellant Thomas and Simmons. They could have very easily indicted Shandy, and they didn't. It's not that they didn't have the information to do it. It's not that they needed more investigation to get him. All of the investigation was done by the FBI, it was listed in the search warrant, and there was nothing else needed. The government chose intentionally on May 8 to indict three individuals and three individuals only. From that point, we can start the clock when the first appearance happens, and that happens on May 12, 2003. From May 12, 2003 to May 28, 2003, we have the first period of time running, and that's 14 days. On May 28, there's an exclusion of time by then-Appellant's counsel, and it was not me. I came in in 2004, May 12. But on May 28, then-Appellant's counsel asked for an exclusion of time. What occurred between May 28 and the next important court hearing, which was in September, that was September 17 of 2003, was the following. You had two unindicted co-conspirators plead guilty and cooperate with the government. When the superseding indictment came into play, was that the only thing that was changed? Was the addition of Shandy, or was there a lot of other stuff that was changed? Including the addition of new charges. Right. Judge Trautman, you said a lot of other things changed, including the addition of new charges. The answer to that question is yes, but I suggest nothing new from the search warrant affidavit that counsel had. I think — is there any evidence in this record at all that the government was attempting to manipulate the speedy trial clock? I say yes. What? I say because they did not indict Mr. Shandy on May 8th, when they indicted Mr. Shandy on December 2nd, 2003. When he made his first appearance on December 10, 2003, it was not — it took only until March to get him to plead guilty. He never expressed an interest in going to trial. So you're just asking us to draw a bunch of inferences. No. I'm asking you to look at the Hall case, the Lewis case. In terms of the government attempt to manipulate the clock, you're asking us to look at inferences. I'm asking you to look at the record and from the record to draw the inference, the reasonable inference that there is no other conclusion that can be drawn from bringing Mr. Shandy into the case in December 3 of 2003. Wasn't there a whole new charge of identity theft added? In the indictment, yes. Not from the investigation. And I think that that's important because out in the offices that we've corrected the investigation as described by the search warrant necessarily circumscribes the ability of the government to come in with a superseding indictment. Anything that's different from the affidavit of the search warrant doesn't get you anything on the speedy clock. What, does the clock just run, keep running? I'm not exactly sure of your question, Judge Trout, but let me try to answer it as best I can. What I'm suggesting is this. All of the investigation that was done, all of the information needed by appellant's counsel and by the government was done prior to May 8, 2003 when the first indictment came down. And why did you say I need a whole lot of time to review this new superseding indictment? When I came, I did not say that in December of 2003. That was appellant's first counsel. Appellant's first counsel made that representation on December 10th. I can't tell you why that occurred. I do not know. Is it in the fair interest there was a whole lot of new stuff? All I can tell you was when I got into the case. I stand by the position, Judge Trout. Counsel didn't say, oh, there's nothing new here, just the addition of Shandy, let's go. I understand. Time out. There's a whole bunch of new stuff here. I need to take a look at it. That's exactly what he said. All I can tell you is this. I know from looking at the affidavit that there is no new investigation done from the time the affidavit was filed, from the time the first indictment was filed in May to when Mr. Shandy was brought in. There was nothing done. Now, whether the government released information in December, that might be a different issue. But there was no new investigation done. There wasn't any. The audiotapes had all been made by Ms. Harris. That had all been completed. There wasn't any new 302s from the FBI. There wasn't any new witnesses that came out of the woodwork. Everything had been completed. The only reason to indict Mr. Shandy was to get a plea agreement from Mr. Shandy, and the government got it within three months. What's going on in the grand jury? I don't have the answer to that question. I don't have the grand jury transcript. But Shandy hadn't agreed to plead guilty at the time he was indicted as far as I could tell. The record does not indicate that. But we do know that he only stayed in the case less than three months, because in March he pleads guilty. And at no time did he express an interest to go to trial. And why that's critical is September 17th of 2003, appellant tells the district court, the government and his lawyer, I'm ready to go to trial in September of 2003. I'm ready to go. And the district court doesn't address that in September of 2003. What the district court addresses is, well, do you want a new attorney or not? When the trial is set in October 28th of 2003 for January, the speedy trial clock is not stopped. And so by the time we get to December, at the end of December, we have – I don't want to mislead the Court. I wrote it down. I promised myself I wouldn't look at this. At the end of 2003, 58 days have gone by. The answer to your question, Judge Trott, is when Shandy came in, is there any inference that the government was manipulating the clock? I say yes. There was no defendant in this case that wanted to go to trial but appellant. Mr. Simmons never expressed an interest. Mr. Thomas never expressed an interest. And Mr. Shandy never expressed an interest. The government knew appellant wanted to go. And what's more critical is in May 12th, 2004, when I came into the case, before I came in, when the hearing was in front of the district court, appellant tells the district court, number one, I have told my lawyer from day one no plea agreement. I want to go to trial. The district court knows he wants to go to trial. His – If you look at Henderson, one might assume that all superseding indictments restart the clock. There are other cases that suggest no, it doesn't necessarily restart the clock. It may just be grounds for a reasonable delay before the clock starts again, but it's the original clock. And which case do you want us to look at before we decide? Hall, Lewis, and Messner, from this Court, saying that it's not reasonable. And that's what the holding in Hall, Lewis, and Messner was, that these individuals that were brought in that case were brought solely to get plea agreements so that they then could go to trial prejudicing appellant because now they had people to testify against them. So you don't set a new clock and you don't stop the one that's running? I say that that's correct. I say that Henderson doesn't abrogate that line of cases from this Court. I say that you can do that. I say the remedy – and I'm trying to sum up – the remedy, reverse and remand, send it back to the district court to determine whether it should be dismissed with or without prejudice. I suggest, if you look at Hall, Lewis, and Messner, that you have ample authority and, looking at the facts of this case, ample authority to do that. And I appreciate that. Thank you. Roberts. Thank you, counsel. You have a little reserved time in case. We'll hear from the government. Ms. Rodriguez. Good morning. May it please the Court. My name is Michelle Rodriguez. I'm an assistant United States attorney. I was the assistant U.S. attorney who prosecuted this case in the district court. A couple of misstatements that I want to correct. I'm sure they were unintentional on Mr. Greiner, but it bears pointing out immediately before we go further in the argument. The first is whether Mr. Shandy made a demand for a jury trial, whether he intended to proceed to trial. In fact, on the day he was arraigned, as indicated in the court's docket record, number 43, on the day Mr. Shandy, I'm sorry, number 51, clerk's record, on the day Mr. Shandy was arraigned, demand for jury trial made. Mr. Shandy had no deal with the United States, and he was indicted to be tried with Mr. King. And he was indicted because of ongoing investigation that occurred from the onset of the investigation and continued through the first indictment. What is your response to counsel's argument that he was named in the search warrant? Is that relevant? Mr. Shandy was a — it's very clear that Mr. Shandy was a person of interest, possibly even a putative defendant from the early stages. His residence, the residence he shared with Mr. King, was in fact a hub of criminal activity. But without the statements of cooperating defendants that occurred during the evolution of the case and the further investigation that we can do, including analyzing phone records and other documents that had been obtained during the course of the early stages, the grand jury stages of the investigation, until that point, we couldn't proceed with Mr. Shandy. Sure, there was a lot of evidence indicating that he was a potential target, definitely a potential target. But the answer was no, not until we could indict him. And as soon as we did, we proceeded swiftly. And Mr. Shandy demanded a jury trial. That's the reason it took so long to bring that case. We wanted to make sure we were prepared to go to trial against Mr. King and Mr. Shandy. Now, that Mr. Shandy saw better of his initial decision and eventually made a deal with the United States is a different matter. But the record is clear, and I've cited the clerk's record. Another misstatement, again, unintentional by Mr. Greiner, was whether or not there was manipulation in connection with the speedy trial clock. Mr. Greiner just told this Court that he believes, and I believe it was to you, Judge Trott, he believes the United States manipulated the speedy trial clock by bringing this indictment. He said there was evidence on the record. Well, you know what? He told the district court, black and white, on his excerpt of record, page 344 and 345, he has no evidence, no evidence that the government did any such conduct. And, in fact, he said... Read exactly what he said, please. He says, we're talking about the DOTA case, which he hasn't brought up in this instance either. And I'll read. Was Shandy going to be a government witness? That's the district court, Judge Shub asking. Mr. Greiner says, yes, he had planned and he's going to be a witness at trial. District court, just like you questioning Mr. Greiner on these slippery points. The court, no. But wasn't he going to be a government witness when he was brought in? Mr. Greiner, I can't make that representation to the court. Contrary to what he just told you. The court, no. That's what they were saying in DOTA, right, Mr. Greiner?  So you don't even have those facts, and we haven't talked about DOTA yet. You don't even have those facts. Mr. Greiner, I can't represent to the court that I do, meaning the facts in DOTA, meaning that the government somehow manipulated the clock in connection with bringing a superseding indictment. I can't represent to the court that I do. All I can represent to the court is this, colon, that when Shandy was brought in on December 8, it was only three months and nine days later, on March 17, 2004, where he pled guilty. He's entered into a cooperation agreement, and he's going to be a witness against Mr. King at trial. Well, all right. So at the time he brings these motions, Mr. Greiner and Mr. King have no facts indicating that Mr. Shandy was brought into the case to get the government a new speedy trial clock. He didn't have them then, and he has no such facts now. Counsel hangs his head on the Hall case. He didn't have the Hall case in his blue brief, and therefore you didn't address it in your red brief. The Hall case was not argued until the reply brief, so you probably have some reaction to the Hall case. I do, Your Honor. And, you know, there are several instances in which this Court has directly and squarely addressed the issue of a superseding indictment and additional defendants being brought into a case after the initial indictment. And they do so in a case called DOTA, which is now about 12 years old, I believe, United States v. DOTA, and that's at 33 F. 3rd, 1179. And I even have the jump site for you, and that's at 1183. It's a 1994 case. Counsel, would you be sure to supply gum sheets to all parties? Sure. DOTA's in your brief. Yes, it is cited in my brief. I'm sorry. But it wasn't cited with this point in mind, exactly. And in DOTA, there is this Court in very clear, unmistakable language discusses the idea of whether or not the United States could bring an initial defendant into a case knowing that defendant's going to be a witness in a case just to start a new clock. And in that instance, the Ninth Circuit said, well, the law is clear, Henderson is clear, a new clock starts. And Mr. Greiner, back in the district court in this case, said, I don't even have those facts. I don't even have the facts indicating that Shandy was brought into this case to get a new Speedy Trial Act clock. Now, the Speedy Trial Rights claim is twofold. As the Court knows, there's not only the issue of the Speedy Trial Act, but there's also his Speedy Trial Rights under the Sixth Amendment. And the United States' position is very clear that neither was there a violation of the Act because neither clock, the clock before Shandy or the clock after, violated the Speedy Trial Act. Is there a bright-line rule with a superseding indictment? Does it always restart a new clock? Or does it sometimes simply provide for the beginning of a reasonable delay in the running of an existing clock? I believe it's the latter, Your Honor, and that's the interpretation that the Supreme Court gives us because it's under a reasonableness standard. But as a practical matter, I don't believe there's been a circumstance that I'm aware of that a district court wouldn't give the latest added, if you will, the last added defendant an opportunity to prepare for trial, which is what Mr. Shandy asked for. And interestingly enough, Mr. King, after Mr. Shandy resolved his case, did nothing about the Speedy Trial Act. Instead, he fired his lawyer, asked for more exclusions of time, and got Mr. Greiner. So all of that preparation of the initial lawyer was for naught. Then Mr. Greiner asks for Speedy Trial exclusions for another year approximately, another eight months. To prepare. To prepare, because the case was obviously complex. He then files motions which exclude more time, and that's not subject to the reasonableness standard. And then when Mr. King makes the inquiry for the Speedy Trial Act issue, how much time is remaining on the clock? That's on December 15, 2004. The judge then, right in front of me, the judge says to me, well, what of it, what of it? And I said, I don't believe there's a problem, Your Honor. The judge said, well, we'll put it on calendar for tomorrow because Mr. King just brought it up. King is standing right here with Mr. Greiner. The next day, King fails to appear. Another 25 days run off the clock. And then Mr. King raises the Speedy Trial. What was the justification for failing to appear, hit by a truck? It turns out that he apparently claims that he couldn't get in in the morning, and he shows up an hour or two hours late and is arraigned later that afternoon, as I recall, on the second superseding indictment. But the point is that he raises a claim for the district court to do some work and for me to do some work, and then 25 days later decides that it's now a claim that's ripe and I'm going to go in and file my Speedy Trial Act claim, and that's resolved immediately. So he waits approximately two and a half, three years almost to bring this claim, and then on the eve of trial actually files a motion. And all of that delay was for his benefit. On top of all of that, he had, in terms of on the Sixth Amendment aspect, one of the Barker issues, as the Court's well aware of, the Barker issues, the length, the reason, the assertion of the claim. I understand Barker. What's the Ninth Circuit case that has it right on resetting or delaying clocks under these kinds of circumstances? Is there a case that you think got it right? I believe Doda, Henderson, and there's another one, I think it's Morales that ---- I didn't hear the last one. Morales. Oh, Morales. That our cases which stand for the proposition that it's very clear when a superseding indictment adds a new defendant, that new defendant is entitled to a 70-day clock and the clock gets reset as to all defendants. And the clock doesn't start until the last defendant is arraigned. And it's well settled. And Henderson, speaking for the Supreme Court, to all of us, is very clear on that point also. So and on the issue of Sixth Amendment rights, in the Lamb case, for example, and I know Judge O'Scann is familiar with the Lamb case having presided over that case. It was a case decided by Judge Fletcher, written by Judge Fletcher about five years ago. Yes, there is. But it's the same district court judge. Now, in Lamb, the man was in, this is the defendant, was in custody for 14 months and was repeatedly during that period of time demanding a speedy trial over his counsel's objection. Here, King wasn't in custody, suffered no prejudice. In fact, he wasn't even worried, wasn't even anxious about this because Mr. Greiner was asked about that also. What is the prejudice here? And Mr. Greiner tells the court essentially when he's asked that, well, he's been waiting. Mr. King had a waiver on file. He didn't even have to appear in court. The waiver for Mr. King was filed, the waiver of his appearance, on January 28, 2004. And that's clear in the record also. So Mr. King, there's no onus on him. He doesn't have to show up for court while these pretrial proceedings are pending. He's not like Lamb at all. And, again, Lamb, 14 months in custody, wasn't sufficient to find a violation of speedy trial rights. Now, I'd like to focus on the, well, there's two other cases, and I have so much to say about them, but the third can I, because it's dear to me, being accused of goading someone into filing a motion or to making a motion for mistrial. You know, there were two mistrial motions made on February 15, 2005, both of them by Mr. Greiner. And the first motion was denied, and the denial occurred before I even said anything. And I'm a trial attorney, sure. I get to be an appellate attorney, too, but I'm not prone to jumping up and interrupting the judge while he's ruling on a decision. And he did. And he ruled on the decision, and after, because I'm a trial attorney, I put on the record after the judge made his decision that I didn't see anyone sleeping. And if I did, I'd have an ethical obligation to do something or to say something. Well, Judge, you're wrong. I saw people sleeping. So I'm fulfilling an ethical obligation, and I'm also making the record clear that the law enforcement officer sitting next to me and I did not see anything to contradict the judge's order. I'm fulfilling my obligations as an officer of the court. And now I'm being told that I'm somehow goading him into six hours later in the afternoon, sui sponte, he brings it up again. And I have not said anything up to that point about the court. Let me ratchet you back to the clock. Have you read the Carseboom case, United States v. Carseboom? No, I did not, Your Honor. No. Thank you. Later that afternoon, he makes the motion. I'm sorry for that. He makes the motion again. And I would only encourage the court to look at Mr. Greiner's own excerpt of record on page 378. On 378, the court says, as three jurors gone, what do you want to do? Counsel. Mr. Greiner is standing at the podium making a motion for mistrial because jurors are sleeping. He says, what do you want to do? Counsel. I'm sitting over there. I'm not being addressed. There's a pause, paragraph. Then the judge starts musing aloud. Ms. Rodriguez, what do you want to do? There's no pause. Nothing indicate that anything more than a rhetorical question. Ms. Rodriguez, what do you want to do? Puts me in a tough position. Puts me in a really tough position. A really tough position. This is the district judge musing aloud. I'm not going to interrupt the district court judge. I'm quiet. The judge then says, I swear to God, I did not see that juror ever close her eyes for a second. That only leaves us 11 jurors, and that's not enough. So it looks like that's it. We'll start the trial next Tuesday morning. It's going to get another jury in here. Decisions made. I said nothing to goad anyone. I engaged in no prosecutorial conduct, let alone misconduct at that point. This was Mr. Greiner at the podium and the judge hashing out a motion that he made. And now, as Mr. King is prone to do, blaming someone else for his problems. Do you get reported to OPR for something like this? If I had done something and this Court had sanctioned it and found that I did, yes, Your Honor. But, again, I didn't say anything in this instance. I'm being accused of doing something that didn't ever occur. And so just the mere allegation is serious, and I take it as such, yes. And to go to the search warrant. Search warrant is the other issue? Yes, Your Honor. Thank you. You know, on the search warrant, I hate to say that Mr. Greiner and Mr. King have failed to identify the issues with clarity again, but they have. And in the search warrant, I would only suggest to the Court that it can't be more clear in and around vehicles when he is dispensing checks. Now, that's what it says literally in the affidavit. He's dispensing checks in and around affidavits. He's dispensing checks later in the affidavit, because you can't say everything on one page, as everyone knows. Later in the affidavit, they talk about him dispensing checks. Now, what about this passage, more fully described below? Counsel put a lot of emphasis on that. He does, and it's true. Later in the affidavit, like some ten, there's a number of references, and I have them in front of me. Well, not to the Thunderbird or the Sebring. Those are in the attachment. Right. It's true that it doesn't say later on in the affidavit, from the Sebring, he dispensed a check to CW, Tabitha Harris. But it does say initially, he dispensed checks to CW from the Sebring. Then three pages later, it talks about a specific date a check is dispensed to this particular person. Stay on mic, please. Yes, Your Honor. Move around in the courtroom. I apologize. You're in the Court of Appeals, Counsel. You're not in the trial court right now. Exactly. But on page 225 of the excerpts of record, this would be page 2 of the affidavit. And it's page 2, the second page of the affidavit. We say, as described more fully below, David King was observed in and around his vehicle when a cooperating witness met with King to receive a fictitious check. I would submit to you, Your Honor, all of you. That was the cut list. No, that was the – the first one was the Thunderbird and the second one was the Sebring. Sebring. In both of those instances, that statement alone is sufficient following, and as you, Judge Trott, are well aware, and I guess it's the Syacom decision that you wrote the opinion for in 1999, about seven years ago. You indicated very, very clearly in that instance persons involved in fraud cases like Mr. King travel with their fraudulent tools, their paper, in their vehicles, and they carry it to their homes. With that statement alone in the affidavit, all of the requirements of this Court's authority in the Syacom decision were decided. Now, later on in the affidavit, it is clear and it is pointed out, and I encourage the Court to go through the affidavit in later pages, and you will see that distributions to the CW are described. Thank you, counsel. Your time has expired. Mr. Gruner, you have some reserve time. Thank you, Your Honor, and I appreciate Ms. Rodriguez's arguments and comments. Let me try to address some of those, and if the Court has any questions. Number one, Mr. Shandy was more than just a person of interest. If the Court will look at the affidavit. Now, what about your statements on 344, 345 that she read, where you said you didn't have any information that this was being done for manipulative purposes? Right. And at that time, I had not read the Hall, Lewis, or Messner case. But in terms of evidence, you told the Court you didn't have any evidence that that was being done. Right. Exactly. And I'll stand by what the record says, and I'll stand by my argument here today that the record does indicate, after I read the three cases, Hall, Lewis, and Messner, that there is an inference to be drawn by Mr. Shandy being brought in on December 3, 2003. It's not the best practice to cite your best case in your reply brief. It is not the best practice. Although, I will tell the Court, when I was writing the opening brief, I did realize that the government's argument could be as exactly what they did argue in their opposition, and that is that Mr. Shandy was brought in. So I do apologize. I should have read the Hall, Lewis, and Messner case prior to. I did not. I still think that those cases control. In the affidavit, Mr. Shandy is more than a person of interest. FBI agent Osborne says he's a co-conspirator. Just because you find a glass slipper does not mean that it fits all feet. It doesn't fit all feet. But in this case, this glass slipper not only fits, there is no other way for that shoe to be on that foot, other than Mr. Shandy was brought in for one purpose and one purpose only. If I can just answer your question, I know my time's up. Here's the reason why I grab onto this, Judge Trott. Here's the reason why I say that Mr. Shandy was brought in to manipulate the Speedy Trial Act. If you look at December 3, when the indictment came down, yes, it brings in new charges, and, yes, it brought in Mr. Shandy. If you look back to the October 28th status conference, October 28, 2003, appellant's then counsel told the district court that he would file an exclusion of time document to exclude time until the trial date, which was set for in January. That never happened. Not only did that not happen, there was never, and I know I'm not at trial, so I'm not going to move around, appellant's counsel at that time did not join any exclusion of time that Defendant Thomas requested. So the clock is running, and at the end of 2003, 58 days have run. Without Mr. Shandy being brought in, the speedy trial clock runs without a question. At the end of 2004, if the court agrees with my argument, not even looking at 2005 when I came into the case, at the end of 2004, December 31, 2004, 74 days had run. Without Mr. Shandy being there, the government has no way of saying that the speedy trial clock has a hurry. Thank you, counsel. Your time has expired. The case just argument will be submitted for decision, and the court will adjourn.
judges: Bezzer, O'scannlain, Trott